HAWKS ET AL. *v.* HAMILL ET AL.

No. 147.   Argued December 9, 1932.—Decided January 9, 1933.

*Messrs. W. C. Lewis,* Assistant Attorney General of Oklahoma, and *Purman Wilson,* with whom *Mr. J. Berry King,* Attorney General, was on the brief, for petitioners.

*Mr. Charles B. Cochran,* with whom *Mr. Lessing Rosenthal* was on the brief, for respondents.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The respondents, claiming to be the owners of a perpetual franchise to collect tolls for the use of a bridge across the Canadian River, brought suit in the United States District Court against the members of the State Highway Commission of Oklahoma, the Attorney General of that State, the County Attorneys of McClain and Cleveland Counties, and other persons, residents of the neighborhood, to restrain a threatened interference with the maintenance of the bridge or the collection of tolls. The jurisdiction of the federal court was invoked upon the ground of diversity of citizenship. The defendants (petitioners in this court) made a motion, without answering, to dismiss the complaint. The complainants moved at the same time for an injunction *pendente lite.* The District Court denied the motion for an injunction, and granted the motion to dismiss. The Circuit Court of Appeals for the Tenth Circuit reversed the decree and directed judgment in favor of the complainants for the relief demanded in the complaint. 58 F. (2d) 41. A writ of certiorari brings the case here.

The facts exhibited in the bill are these. On April 22, 1911, the County Commissioners of McClain County, Oklahoma, adopted a resolution whereby there was granted to Carter and Halsell, or their assigns, a franchise to construct and operate a toll bridge across the Canadian River at the City of Purcell, the bridge to be erected within the time prescribed by law. The tolls enumerated in a

schedule were not to be increased "by the bridge company," though they might be reduced. By the terms of the resolution, the grant was to be "perpetual," subject only to such limitations as were provided by law. The grantees were to be at liberty to transfer their rights and privileges to "any individual or corporation," with the same effect as if the grant had been made to the assigns directly. On May 16, 1911, the County Commissioners of Cleveland County on the other side of the Canadian River adopted a like resolution for the grant of a like franchise to the same grantees. On May 18, 1911, Carter, one of the grantees, together with Walling and Hamill, the present respondents, caused a corporation, known as the Purcell-Lexington Toll Bridge Company, to be organized under the laws of Oklahoma, with a corporate life of twenty years. Thereafter in December, 1911, while the bridge was in course of construction, the grantees of the franchises, together with the respondents, conveyed the bridge, its approaches and all the rights and privileges embraced within the franchises or either of them to the Purcell-Lexington Toll Bridge Company, its successors and assigns. The corporate life of the Purcell-Lexington Toll Bridge Company was to expire, as we have seen, on May 18, 1931. Before that time, and on April 2, 1931, the bridge company conveyed to the respondents and to Carter, and their assigns, the bridge and the accompanying franchises, the respondents receiving afterwards from Carter an assignment of his interest, whatever it might be. Thereupon the defendants, who are the petitioners here, gave notice that on May 18, 1931, the bridge would become a free bridge and part of the free highway system of the State of Oklahoma. The members of the State Highway Commission, the Attorney General, the County Attorneys, as well as the neighboring residents, who, it seems, are also the County Commissioners, announced a purpose to prevent the collection of tolls by the respond-

ents, and to cause the bridge to be kept open for free and unimpeded passage. This suit for an injunction followed.

The District Court held that the County Commissioners were without authority to grant a franchise to individuals except in trust for a corporation organized under the bridge law; that the term of the corporate life was also the limit of the duration of the privilege to charge and levy tolls; that a perpetual franchise, if intended, would be void under Article II, § 32 of the Constitution of Oklahoma, prohibiting "perpetuities"; and that the bill should be dismissed. The Circuit Court of Appeals, in reversing this judgment, held that the franchises were not invalid because granted to individuals; that upon assignment to a corporation organized for a term of twenty years, the franchises were not cut down in respect of their duration, but continued in full force when conveyed by the assignee to others; that the term "perpetuities" as used in Article II, § 32 of the Constitution of Oklahoma had in view the creation of future estates and did not limit the enjoyment of a privilege or franchise; and that the complainants should have an injunction as prayed for in the bill.

Article II, § 32 of the Constitution of Oklahoma provides: "Perpetuities and monopolies are contrary to the genius of a free government and shall never be allowed, nor shall the law of primogeniture or entailment ever be in force in this state." Construing that provision the Court of Appeals said: "We do not doubt that the word 'perpetuities' . . . was not intended to mean or be equivalent to perpetual franchises, but was intended to limit the power to pass titles that would vest *in futuro.*" But the Supreme Court of Oklahoma has not circumscribed the word so narrowly. It has said that a forbidden perpetuity is created when there is granted to an individual or corporation a perpetual privilege or franchise

It has gone farther: it has said that a privilege or franchise is perpetual 'if indefinite in duration, though it be subject to revocation at the pleasure of the legislature. The question came before the court in *Okmulgee* v. *Okmulgee Gas Co.*, 140 Okla. 88; 282 Pac. 640. The legislature of Oklahoma had passed an act whereby a public service corporation holding a franchise from a municipality for a fixed 'term of years was to be at liberty to exchange it for a revocable permit. The court said that such a permit, if viewed as a grant from the municipality, was forbidden by Article XVIII, § 5a, which provides in effect that no franchise shall be granted by a municipal corporation for a longer term than twenty-five years. On the other hand, if the permit could be viewed as one proceeding directly from the state, the court said that it would then be a perpetuity within the prohibition of Article II, § 32. The permit was not saved by the reservation to the legislature of a power to revoke it. In the view of the court (p. 98), a franchise "not limited in its existence to a fixed and definite period of years" is to be classified as "a perpetual franchise," and hence an unlawful perpetuity. To avoid misapprehension the court at the end of its opinion summarized its conclusions (p. 100). "Any act of the legislature which provides for issuing a license, revocable permit, indeterminate permit, or other instrument in the nature of a franchise which is not limited as to its time of existence, violates section 32 of Article II of our Constitution." See, to the same effect: *In re Okmulgee Gas Co.*, 141 Okla. 98; 284 Pac. 70; *In re Oklahoma Power Co.*, 141 Okla. 100; 284 Pac. 12.

We do not now determine what meaning we would give to the Oklahoma Constitution if the question were before us as an original one, unhampered by any pronouncement of the courts of that state. Much can be said in support of the respondents' position that the perpetuities denounced are those arising from the creation of future

estates or from restraints upon alienation without reasonable limit. The question is one distinctively local in origin and content. The prohibition is embodied in the local Constitution. Not only that, but it is designed to give effect to " the genius " of the government, an impalpable existence that can best be apprehended and defined by perceptions and experiences sharpened and developed through the associations of the vicinage. " In a case involving local history, as this does, we should be slow to overrule the decision of courts steeped in the local tradition, even if we saw reason for doubting it." *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 32; cf. *Diaz* v. *Gonzalez*, 261 U. S. 102, 105, 106. To define a " perpetuity " for a young and developing community there must be recourse to something more than the pages of a dictionary. The word to be defined, in common with words generally, will have a color and a content that will vary with the setting. *Towne* v. *Eisner*, 245 U. S. 418, 425; *International Stevedoring Co.* v. *Haverty*, 272 U. S. 50; *Surace* v. *Danna*, 248 N. Y. 18, 21; 161 N. E. 315. It comes down to its interpreters freighted with subtle implications, with the " tacit assumptions," the " unwritten practices," the " thousand influences " and " values " that " logic and grammar never could have got from the books." *Diaz* v. *Gonzalez, supra*. Out of two or more meanings that were possible and plausible, the State of Oklahoma has picked the one comporting best in the thought of her official spokesmen with the " genius " of her history. The mists of our own uncertainties are scattered when pierced by this authentic evidence of the law of the locality. *Chicago, M., St. P. & P. R. Co.* v. *Risty*, 276 U. S. 567, 570; *Sioux County* v. *National Surety Co.*, 276 U. S. 238; cf. *Porter* v. *Investors Syndicate*, 287 U. S. 346.

We are urged by the respondents to exert a power of independent judgment though the law to be interpreted be a constitution or a statute, and not merely the form of

law which has come to be spoken of as general. Cf. *Burgess* v. *Seligman*, 107 U. S. 20. The power, we are told, exists because at the grant of these franchises in 1911, the Courts of Oklahoma had not yet spoken as to the meaning of the Constitution by defining the "perpetuities" within the zone of its restraints. *Kuhn* v. *Fairmont Coal Co.*, 215 U. S. 349; *Moore-Mansfield Construction Co.* v. *Electrical Installation Co.*, 234 U. S. 619, 625; *Edward Hines Trustees* v. *Martin*, 268 U. S. 458, 463. Obedience is due to the courts of the state if the decisions claiming fealty are so many and unequivocal as to make out a "rule of property." *Edward Hines Trustees* v. *Martin, supra,* at pp. 463, 464. As to this there is no denial. The argument is that the fetters of obedience are released when there is only a single state decision, and this subsequent to the transaction out of which rights and duties have developed. *Kuhn* v. *Fairmont Coal Co., supra; Edward Hines Trustees* v. *Martin, supra.* One hurdle, it is said, will be overlept if there are no barriers beyond.

Choice is not so free as the argument assumes. If the single decision interpreting a constitution or a statute is clear and unequivocal, submission to its holding has developed in these days into a practice so nearly uniform that there is little need to consider whether under pressure of extraordinary circumstances there is a privilege to deviate. Whatever doubt as to the practice may have prevailed in days gone by has been dispelled by recent judgments. *Chicago, M., St. P. & P. R. Co.* v. *Risty, supra; Sioux County* v. *National Surety Co., supra.* Indeed the radiating potencies of a decision may go beyond the actual holding. A wise comity has decreed that deference shall at times be owing, though there may be lacking, in the circumstances, a strict duty of obedience. Cf. *Sim* v. *Edenborn*, 242 U. S. 131, 135. An opinion may be so framed that there is doubt whether the part of it invoked as an authority is to be ranked as a definitive hold-

ing or merely a considered dictum. What was said in Okmulgee v. Okmulgee Gas Co., supra, as to the meaning of perpetuities was probably intended to be a definitive holding. Cf. 141 Okla. 98; 141 id. 100. To be sure there is room for argument that limiting distinctions will have to be drawn in the future. We must leave it to the courts of Oklahoma to declare what they shall be. But the result will not be changed though the definition of perpetuities be something less than a decision. At least it is a considered dictum, and not comment merely *obiter*. It has capacity, though it be less than a decision, to tilt the balanced mind toward submission and agreement. Cf. *Sim v. Edenborn, supra; Lankford v. Platte Iron Works*, 235 U. S. 461, 474. No controversy is here as to the impairment of the obligation of a contract in violation of the restraints of the federal constitution. We are not to confuse the standards of independent judgment appropriate in such conditions (*Coombes v. Getz*, 285 U. S. 434, 441; *Shriver v. Woodbine Bank*, 285 U. S. 467, 475) with those appropriate where the only basis of jurisdiction is diversity of citizenship. The Oklahoma decision as to the validity of a grant in perpetuity is not an act of legislation, and would not have impaired the contract embodied in the grant though it had overruled a contrary decision previously rendered. *Tidal Oil Co. v. Flanagan*, 263 U. S. 444; *Fleming v. Fleming*, 264 U. S. 29; *Great Northern Ry. Co. v. Sunburst Oil & Refining Co.*, 287 U. S. 358. What is at issue in this case is not an actual or even a claimed impairment of any right or privilege assured to the respondents by the Constitution of the nation. What is at issue is the validity of a privilege or claim of privilege to obstruct a bridge across a public stream. The case does not call for a decision as to the ownership of the structure of the bridge or the right of the complainants to tear it down hereafter. Cf. *State v. Lawrence Bridge Co.*, 22 Kan. 438, 463. The decision that is called for is one as to

the privilege of the complainants, while maintaining an obstruction of navigable waters, to exact payments from the public. The statutes of Oklahoma are explicit that tolls may never be collected unless permitted by a franchise (Wagon Road Act, Consolidated Oklahoma Statutes, § 5627; Toll Bridge Corporations Act, Consolidated Oklahoma Statutes, § 5367). In controversies so purely local, little gain is to be derived from drawing nice distinctions between dicta and decisions. Disagreement with either, even though permissible, is at best a last resort, to be embraced with caution and reluctance. The stranger from afar, unacquainted with the local ways, permits himself to be guided by the best evidence available, the directions or the counsel of those who dwell upon the spot.

The case thus far has been considered from the viewpoint of the substantive law, the basic rights and duties contested by the litigants. There is another path of approach that brings us to the same goal, an approach along the line of the law of equitable remedies. Caution and reluctance there must be in any case where there is the threat of opposition, in respect of local controversies, between state and federal courts. Caution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties. In such circumstances this court has said that an injunction ought not to issue " unless in a case reasonably free from doubt." *Massachusetts State Grange* v. *Benton,* 272 U. S. 525, 527. The rule has been characterized as an " important " one, to be " very strictly observed." 272 U. S. at 527, 529. Compare *Gilchrist* v. *Interborough Rapid Transit Co.,* 279 U. S. 159; *Cavanaugh* v. *Looney,* 248 U. S. 453, 456. It is such interference by the process of injunction with the activities of state officers that the respondents now seek. The members of the State Highway Commission believe it to be

their official duty to take possession of the bridge, and propose to act accordingly. The Attorney General of the state is about to institute proceedings at law and in equity to vindicate the public rights or what he believes to be such rights. The County Attorneys of McClain and Cleveland Counties propose to sue for fines and penalties. All these activities the respondents ask us to enjoin. Indeed all have been enjoined by the decree under review. Only a case of manifest oppression will justify a federal court in laying such a check upon administrative officers acting *colore officii* in a conscientious endeavor to fulfill their duty to the state. A prudent self-restraint is called for at such times if state and national functions are to be maintained in stable equilibrium. Reluctance there has been to use the process of federal courts in restraint of state officials though the rights asserted by the complainants are strictly federal in origin. *Massachusetts State Grange* v. *Benton, supra; Stratton* v. *St. Louis S. W. Ry. Co.*, 284 U. S. 530; *Matthews* v. *Rodgers*, 284 U. S. 521. There must be reluctance even greater when the rights are strictly local, jurisdiction having no other basis than the accidents of residence. The need is clamant in such circumstances for cautious hesitation. If there were to be a concession *arguendo* that the meaning of " perpetuities " is still an unsettled question after the decisions in Oklahoma, there is surely no room for a contention that a meaning in opposition to those decisions is reasonably free from doubt. Our process does not issue unless the path is clear.

What has been written has had its basis in the assumption that an indeterminate franchise is a perpetuity within the meaning of the Constitution of Oklahoma, or at the very least that state officers acting in that belief are not subject to an injunction at the instance of the federal courts. The case for the respondents would be beset, however, with other doubts and difficulties if all these were

to be removed. There would still remain the uncertainty whether the franchise granted by the county was to the grantees for their own use or for the use of a corporation to be organized thereafter; whether the corporation was to be one under the " Wagon Road " law, with an indeterminate duration, or under the " Bridge Companies " act, with a duration of twenty years; and whether the public policy of Oklahoma, disclosed by her statutes and decisions, and irrespective of decisions elsewhere, sets a limit upon the toll right, or what is known as the secondary franchise, coterminous with the primary franchise to exist and engage in business in a corporate capacity. By the statement of these questions we convey no hint as to the answer. We do no more than emphasize the complexities of law as well as of policy in which the respondents' title is involved, and the unwisdom of superseding the official acts and powers of the agents of the vicinage by writ out of a federal court.

The decree of the Circuit Court of Appeals must be reversed, and the judgment of the District Court dismissing the complaint affirmed.                    *Reversed.*